I want to propose a little different time arrangement. Counsel for plaintiffs, all the plaintiffs, can take 10 or 15 minutes to start. Then we'll hear from each of the companies. And you can use whatever time is left of that first 20 minutes in rebuttal. So if you use 15 minutes in your direct argument, you'll have 5 minutes for rebuttal or 10 and 10. Is that okay, acceptable to everyone? Okay, I understand everyone is here. So let me call the first case, which is Ross and Levin v. AXA and Yarborough and Robanus v. MetLife. One blue brief. Good, thanks. Good morning and may it please the court. Good morning. My name is Eric Miller and I represent the plaintiffs. The district court erred in dismissing the complaints in these cases for lack of standing. The complaints allege that the defendant insurance companies violated New York law by failing to disclose their use of shadow insurance transactions, thereby making their financial situation appear stronger than it actually was. And as the New York- Sorry, I'm functioning with a broken rib. The court is very helpful. Sorry, Your Honor. Thank you. Okay, thanks. That's good. Thank you. Making the company's conduct made their financial situation appear stronger than it actually was and as the New York Department of Financial Services found- Counsel, do you have much of a case left after Spokio? Indeed we do, Your Honor. You have to explain that to us. Okay. Well, what Spokio recognized- Spokio reaffirmed the traditional three-part test for standing, that there has to be an injury that is fairly traceable to the actions of the defendant that would be redressable by a favorable judgment. It has to be concrete. And what Spokio- The injury here can be conceptualized in several different ways, all of which are consistent with Spokio. The first of those is that the insurance company's conduct exposed the policyholders to a greater risk of default in Spokio. The risk has to be actual and imminent, doesn't it? The injury has to be imminent. Yes, I mean the injury rather. And the problem I have here is that the injury, the actual injury would be the nonpayment of the insurance, it seems to me. Granted there's a risk, but the risk is tied to that. And the contingencies that would have to occur before there would be a nonpayment are really quite exceptional. There are a bunch of them that have to occur. They're listed in Judge Furman's opinion, and we don't have to go through them now. But then, and in addition to all of that, there would have to be a demand for insurance that would be an aggregate demand that would be triggered by some catastrophic event that required everybody to claim their insurance at the same time. And that is speculative. It's in the future. And so it's really a risk of nonpayment in the future here that is attenuated based upon all of these circumstances that would have to occur. The nonpayment by the primary, the reinsurer not paying, then calling on the letter of credit. The letter of credit is backed by a parental guarantee that would have to be nonpaid, not paid, and there still would not be enough capital to pay it. So it's all very speculative as to what would happen under these circumstances. And how is that an imminent problem? So you're correct as a legal matter that a risk to constitute an injury cannot be unduly speculative. But this risk is not unduly speculative. It's identifiable, but it's speculative as to whether the risk would ever materialize. That's what's speculative. I mean, just because some regulators have said you've got to do better in terms of shoring up the backing for reinsurance in New York than you do in, I don't know, Oklahoma, that means that New York has stricter rules than these other states do. But that doesn't change the calculus, does it? So by definition, when you're talking about a risk, there is some uncertainty as to whether the risk will materialize. But when you look at the factors that this court has looked to in assessing whether a risk constitutes an injury, and I'm referring to cases like Bauer against Veneman and NRDC against FDA, what the court has looked at is a couple of the factors that are present here are, one, this is not just us saying that it's a risk. You have a government agency that has said that this conduct exposed policyholders to risk. Two, you have a statute. There it was a state statute, but a statute that is specifically designed to deal with risk. A federal statute can't create standing, much less a state statute, if there's no Article III standing. The legislatures can't go around, and the states cannot be writing tickets into the federal courthouse. The legislature cannot alter the requirements of Article III, but as Spokeo recognized, the judgment of the legislature is relevant in assessing how concrete a harm is. It's one factor to take into account. And when the legislature has created this... It's not determinative, is what I'm saying, by itself. We don't say that it is by itself determinative, but it is relevant that the legislature has identified this risk as one, that it has created this disclosure requirement in order to protect against, and part of the reason they did that, of course, is that if by the time that the risk actually comes to fruition, by the time it actually materializes, there's no remedy for the plaintiffs, because if we try to sue at that point, the companies will already be insolvent, and there will be no recovery. So... I want to be crystal clear about this. The risk you're talking about is the risk that your client or another class member has gone to Equitable Life Insurance and bought an insurance policy, and when he or she dies, no money. Yes, yes. That's the concern that has animated regulation of insurance companies for many, many years. Abstract concern is not the same thing as actual harm, is what I'm saying, imminent harm. But it is not abstract, because as the Department of Financial Services found, the specific practice that was engaged in here harmed these policyholders by exposing them to a greater risk than... Are you still arguing that the policies are worth less than they would be if there was no shadow insurance? Yes, and that's another way... But there is a study, the Wisconsin study came to the opposite conclusion, that actually premiums would go up under the circumstances if there was no shadow insurance. And that's what I don't understand. The study found that when the company uses shadow insurance to artificially lower its reserves, it is able to offer insurance more cheaply. That's consistent with the defective product cases that we've cited. When you make a product using inferior components, you can sell it more... But I thought the problem was that you paid too much for the insurance. Actually, you paid the right price for the insurance. We paid more than we should have for the insurance, as it actually was. That's a conclusion that you've reached in your... It seems to me it's contradicted by that study. That's all I'm saying. Judge Koch, I think, pointed that out, that you have a conclusory statement that you're going to pay less, but actually you're going to pay more. And the study shows it. So where do we go with it? There's a contradiction there. The study said, and this is at pages 181 to 182 of the Joint Appendix, that the nominal price goes down but at the cost of increasing the probability of default. So the price that the purchaser or the policyholder cares about is the risk-adjusted price, and the study does not suggest that that has gone down. Let me ask you this. I think I read it somewhere in the briefs, and correct me if I'm wrong, that neither of these insurance carriers in their history has defaulted on an insurance policy, on a life insurance policy. Is that right? That is correct. So this is, in both cases, metropolitan and equitable over 100 years. So give me an example of an occurrence or cataclysm that you think would trigger this parade of events that might cause harm to a policyholder. Well, I can give you an example, and it's from quite recently. It's what happened to AIG. And as the Department of Financial Services report explains, the parade of events is... AIG is in a very different business. AIG's business model does not resemble equitable. There's life insurance. This is life insurance. But the parade of events is really a series of things that are all correlated with each other, and they're all correlated with a general financial... In other words, are you saying in order to even cogitate about a parade of events, we have to assume that these two life insurance companies resemble AIG? Well, I mean, you're correct, of course, that they're in a somewhat different... It is a different business. But the point is that... And this is in... There would have to be multiple deaths at the same time and people making claims and claims being made not against other insurers, but all of them are insured by these companies. What could happen? What could cause that? Well, I mean, it's not just... I mean, it's the number of deaths. It's also the size of the assets, which can go down in a financial crisis. But, you know... Yeah, there's a capital reduction somehow. But that is, you know... We're hypothesising here that the letters of credit are there and so forth and that there's all these non-payments. So you're saying that there would have to be both the number of deaths to make the demand for payment of life insurance and the confluence of a financial catastrophe. So that even adds another variable to the point. I wasn't thinking about that. So you'd actually have to have a financial collapse as well. Happening at the same time. At the same time that everybody dies and everybody happens to be insured by your companies. And I can't imagine what you're talking about if that's what we have to deal with. Well, I mean, what I would refer you to is the report of the regulator and... Well, we've seen that. That doesn't answer the question. It's a question of the risk and whether it's, you know... The regulator has said that they sort of emphasise this risk. But the question is, what we're trying to understand is what the risk really is. And apart from what the regulator has said here. I mean, you know, and that's... The risk is a larger than anticipated... Higher than anticipated mortality rate and a lower than anticipated return on the capital. A reduction in the capital. Why can't your clients go out now and buy insurance that doesn't have this risk? Just, you know, cancel their policies and go start paying premiums to another insurer. Because there is a lock-in effect with life insurance. At this point, the policyholders are older. The premiums would likely be much higher if they were to go out and buy a new policy rather than sticking with the policy that they had. Can I ask you a hypothetical? Sure. Assume we found that you do have Article III standing and this case went to trial. What relief are you seeking? Do you want to be let out of these policies? You just suggested that you wouldn't want that. The relief provided by Section 42-26 of the New York Insurance Law is a return of the premium. So you would return the premiums and no insurance. You wouldn't get the growth. You wouldn't get the build-up of the premiums, right? No, the relief under the statute is that it's not rescission of the contract. It's that they get the return of the premium from... And no insurance. ...and continue to have the insurance. You don't get the growth on the premiums during the period the company had the money. Is that correct? We continue to have the policy, but we get back... You have the policy and you... Do you have the policy but don't pay any premiums or do you pay an adjusted premium? Have you thought about this? I think... It is a penalty statute, and the penalty... I think I can refer you to the text of the statute, which is 4226D, that shall pay as a penalty, a penalty in the amount of such premium or compensation, which may be sued for by any person aggrieved. And I think one of the things that that... What does that mean to you? It means that the contract remains in force, but we get back the premium that was paid during the... Are you looking for free life insurance for your clients? That is the recovery that the statute... What about future life insurance? Why can't they cancel the policy at this point if they're not getting any premiums in the future? You know everything now. It's been disclosed. But still you get free life insurance forever? Until they die? I confess I'm somewhat uncertain how that would work, and perhaps I can address that on rebuttal, if I could. Okay, good. So you have about five minutes left of the 20. Consult with your experts here. Thank you. Okay, we'll hear first from AXA, Equitable, or Metropolitan Life, whichever. Okay. Pull the microphone down. May it please the Court, Elizabeth Sachs, debtor for Defendant Applee, AXA Equitable Life Insurance Company. The questions that the Court has posed, I think, go directly to just how speculative the allegations here, the claimed harm here is. But I'd like to... The statute does provide a remedy for nondisclosure, correct, if you're an aggrieved party. Now, that may be... I take it that in other federal cases that say if you're an aggrieved party, that's the equivalent of actual harm, that's the equivalent of Article III standing. But still, there is a remedy under the statute here. And if there's a remedy under the statute and it is in accord with Article III... The statute is in accord with Article III standing, then there is... And the remedy can be nondisclosure, right? I mean, all the... There is a disclosure issue in this case. That's right, Your Honour. This is a disclosure statute. Exactly what the elements of a claim under the statute are disputed between the parties, but that would go to the merits. But it clearly does give a private right of action to a person who has been aggrieved, whatever that means, but it has to mean at least an injury in fact. Right. But obviously the statute can't confer Article III standing. Correct. As your adversary said, it can be used to inform the question, can't it? Well, Your Honour, I don't think it's really a debatable proposition that a person who has been misled to their detriment by a misrepresentation has standing to bring a claim in respect of that detrimental reliance and that misrepresentation in many contexts. Common law fraud... Pardon me? Why isn't that what we have here? Because we don't have any injury. It is what's alleged. Well, I think what's vitally important here, Your Honour, is what's not alleged. The plaintiffs here do not allege that they purchased their policies based on a misunderstanding of the fact that is alleged not to be disclosed. That is to say... You're saying that they weren't aware of... It didn't influence their decision one way or the other. They bought life insurance. They were not influenced one way or another by whether there was or wasn't a parental guarantee providing a credit enhancement to the bank that gave a letter of credit as collateral for the reserve credit. Why weren't they entitled to rely on the assumption that your client was in compliance with applicable regulations? Well, Your Honour, there's no allegation that our client wasn't in compliance with applicable regulation with respect to what was required to be disclosed in their statutory annual statements, which is the predicate for plaintiff's claims. There's no... What you're saying is that what they did was lawful and all the New York financial agency said was that, well, this happens to be a loophole in the law, but it's like a tax loophole or any loophole. Lawyers can find a way, and they found a way here to enable these companies to do what they did. That's exactly right, Your Honour. What the regulator is saying is, look, disclosure of these parental guarantees has not heretofore been required. I, the New York superintendent, am going to require it going forward, and he did. And by the way, that disclosure is required in the portion of the statutory annual statement that is not publicly available. So if the superintendent had thought this was information that was material to policyholders or to rating agencies or to anybody else who's a member of the general public as opposed to of interest to the regulator, you would think it would be in the publicly available... I didn't realize that. It was disclosed to the regulator all along? There was no part... Filling out the statutory annual statement, Your Honour, is like a tax return. You know, there are boxes that require information, and you fill in the boxes. It's quite analogous. There was no box that, prior to 2013, required the disclosure of the parental guarantees per se. I thought you were saying that they knew about it. The regulators knew about it. What I'm saying, Your Honour, is that after 2013, the disclosure became required. There was added an exhibit to the statutory annual statement that sought that information, but that exhibit is available only to the regulator. It's not part of the publicly available... Was it possible that the companies were, in fact, using this method of reducing their reserve, but it was just not reported? Well, Your Honour, the reduction in the reserves was reported all along. The allegation is not that there was any secrecy around the reserve credits. Let me explain, if I may, how this actually works. So if there's no reinsurance, the insurance company has to hold admitted assets to support its reserve liabilities. That's alleged in the complaint, and it's, in fact, the case under New York law. If there's a reinsurance transaction, then the insurer who's ceding the losses to the reinsurer can take a reserve credit for some of those reserve liabilities. All is set forth in New York law, if and only if there is collateral to support the reinsurer's obligations that meets the requirements of New York law. For example, a letter of credit. Right, but not just any letter of credit, Your Honour. It has to be a letter of credit that complies with New York law, which means it must be clean and unconditional, it must be irrevocable, and it must be evergreen. That's not the standard in some of the jurisdictions where the reinsurance companies are located. Is that correct? But, Your Honour, in order for AXA Equitable, which is a New York-regulated insurer, to take a reserve credit, it must have collateral that complies with New York law, and there is no allegation that it did not, and, in fact, it did. So let me explain what that means in practice. The parental guarantee seems to be the issue, and that's what the New York regulators are complaining about now. Right. And the parental guarantee was satisfactory, is satisfactory in other states, presumably. And that's where these reinsurers were established, the captive reinsurers were established, right? Your Honour, let me be clear about one thing. There is no allegation in the complaint, and there is nothing in the superintendent's report that says that a parental guarantee to the bank of the letter of credit that is provided as collateral for the reinsurer's obligations is in any way unlawful under New York law. That is a credit enhancement to the bank. The regulator doesn't regulate the bank. It just enables the reinsurer to get the letter of credit with the backing of its parent's larger balance sheet. That's all it is. It has nothing to do with either the policyholder or AXA Equitable. What matters to the policyholder and AXA Equitable is this. If there is a claim that AXA Equitable makes to the reinsurer and the reinsurer cannot for whatever reason pay, then AXA Equitable has the absolute unconditional right to draw down the letter of credit. So it has the cash to pay the claims, absolutely. Without the reinsurance, it would have had admitted assets. With the reinsurance, it has the same amount of cash. My understanding, I guess, is that the parent and AXA are, in effect, interchangeable. That is, the parent is given the guarantee, but then the guarantee ultimately has to be backed by AXA itself. Am I wrong on that? You are, Your Honor, respectfully. The letter of credit is for the benefit of the insurer, AXA Equitable, in this case. Before the guarantee ever kicks in, AXA Equitable draws down the letter of credit. It has the cash. Once it has the cash, that cash is, in effect, trapped in that entity and subject to the jurisdiction of the New York Department of Financial Services. The parent company is a public holding company in France. It is separately regulated and not an insurance company and subject to the laws of a different jurisdiction. It has no power to prevent that drawdown from occurring or to influence what happens to the money. The question then, under those circumstances, is what about the guarantee? The guarantee backs the letter of credit, right? But that's the bank's risk, Your Honor. It's got nothing to do with the policyholder. Imagine a scenario where there's some, you know, market shock. Doesn't that figure into the equation of what the risk is? No, it doesn't, Your Honor, for the following reason. Nonpayment? Because once the guarantee is used up, there is no money for the bank to pay the guarantee. Your Honor, let me back up, because I think Your Honor is operating under a misapprehension of who owes what to whom. The letter of credit is a credit facility provided by the bank. The bank is responsible for paying upon a proper presentation by the beneficiary, which is acts equitable. All the guarantee does is provide the bank with assurance that if the letter is drawn down and the reinsurer doesn't repay the bank, then the parent will repay the bank. Now, suppose we've got this hypothetical liquidity crisis that plaintiffs have hypothesized. What happens then? Well, acts equitable, tenders losses to its reinsurer. Reinsurer hypothetically doesn't pay. Acts it goes to the bank, draws down the letter of credit. It's got the cash. Now the bank says, okay, reinsurer, you owe me that money. Reinsurer says, sorry, I don't have any money. I'm in a liquidity crisis. And so the bank goes to the parent and says, parent, repay me the money. Under plaintiff's scenario of a trillion-dollar balance sheet not being able to meet that obligation, parent says, sorry, I don't have any money. I can't repay you, bank. Well, that's unfortunate for the bank. But acts equitable has the money. It has the money to pay claims. And the bank can't come after acts equitable for that money. Acts equitable is the beneficiary. It's not a borrower. I see. So what you're saying is basically the risk doesn't ‑‑ it's not a risk to the policyholder. It's a risk ultimately to the bank itself who paid on the letter of credit and can't get reimbursed. That's exactly right, Your Honor. And I think that goes to what the superintendent's 2013 report is really about. What the superintendent says he's concerned about, and this is on page 2 of the report, is that transactions of this kind could potentially affect the stability of the broader financial system. Now, if you're a regulator, it's, you know, perfectly legitimate concern to think about the stability of the broader financial system. But plaintiffs don't have a cause of action to protect the stability of the broader financial system. They have to allege that they have some particular and concrete injury that's peculiar to them. And that's what they've been unable to do here. So isn't the increased risk the injury claimed? The increased risk of nonpayment? I believe that's what I heard opposing counsel say in his brief. Your Honor, the problem with that theory is twofold. Number one, as I hope I've just explained, there in fact is no increased risk to the policyholder because the letter of credit secures the obligations that otherwise would have been held as admitted assets. The policyholder's going to be paid no matter what is what you're saying. That's right. And plaintiffs have no theory. For some reason can't pay on the letter of credit. Well, now we're really in the realm of speculation, Your Honor. And, you know, I think as Clapper and many other decisions of the Supreme Court make clear, not only is an injury that's purely conjectural and hypothetical like the injury here insufficient to support standing, but an injury that relies on the intervening conduct of a third-party actor who's not before the court is also insufficient to support standing. So, you know, we can imagine whatever we like about the bank. That doesn't help plaintiffs at all. The bank couldn't have prudently issued this letter of credit without some assurances of repayment, which were supplied by the guarantee from the parent. Your Honor, typically the purpose of the guarantee is to get better pricing. But, yes, let's assume that the bank was willing to lend to the reinsurer on the strength of the parental guarantee, but not without the parental guarantee. Well, so what? What does that have to do with the plaintiffs, with the policyholders' risk of repayment? That's just an economic issue for the insurance group as a whole. Counselor, your time has expired. Thank you very much, Your Honor. Thank you. We'll hear from MetLife. Good morning, Your Honors. May it please the Court. I'm Sandra Hauser from Dentons, representing Metropolitan Life Insurance Company, which I will refer to this morning as MetLife, just for convenience. Your Honors have heard this morning already quite a bit of discussion of the core issue in this case, which is the utterly conjectural nature of the plaintiff's claim. As Your Honors know, and Judge Walker, as you articulated earlier, it's the plaintiff's burden not to show some theory that isn't wholly implausible, that we could imagine in our academic minds something unfolding. The plaintiff's burden is to show certainly impending injury, and we contend that none of their theories come anywhere close. And not only does the injury have to be certainly impending, it has to be fairly traceable to the claim. So I would take Your Honors back to look a little bit at what the claim is here and the statute under which the plaintiff sued, because the claim here is not that they were lied to by MetLife. They don't even challenge MetLife or AXA's use of captive reinsurance. The only claim in this case is that the insurers omitted to disclose certain details, particularly the parental guarantee, which, by the way, was regulator-approved, in these particular documents, which are the statutory annual statements to regulators. Those disclosures were not required by the regulators, and they were not required by statute, and the plaintiffs never claim that they wouldn't have purchased the policies had they known. And when you think about a scenario where, both with and without these disclosures, plaintiff's situation is exactly the same. They have the same life insurance policy. They've alleged no facts to show this court that either of these companies will be unable to pay. That doesn't even get them past Tier 1 of the parade of things that we've shown the court might happen here. They first have to show that there's some certain likelihood that the insurers will be unable to pay in the first instance. It doesn't have to be a certain likelihood. A likelihood would do. Well, there has to be a likelihood, and when you're talking about a risk of injury, it has to be a certainly impending risk under this court's precedent, and that's more than just the academic exercise that I think the plaintiffs have. Okay, so hypothetically, if and when the buildings start falling and banks come up with no liquidity, can they sue then? I mean, do we have to wait until there's a real risk of nonpayment on the policies before we allow this case to go forward? Well, there has to be something more than this hypothetical scenario where you have both simultaneously a catastrophic loss of life. The injury has to be imminent somehow. There has to be some indication that there is a likelihood that the parade of horribles will occur. In addition, what I think has just been pointed out here is that it's not just the inability to pay. It's the parental guarantee becomes worthless. That's a risk that falls on the banks, and presumably the bank would have to not pay on the letter of credit somehow at the outset, before the parental guarantee even kicks in. Well, that's exactly right, because as Ms. Sacksteder was explaining just a moment ago, what's required under New York law is an evergreen letter of credit in the exact same amount as the captive reinsurance asset so that it can be drawn down to give the insurance company cash in hand. So when you think about the disclosure issue, right, the company is exactly situated, when it draws down that line of credit, has the cash in hand instead of the reinsurance. That can't possibly leave policyholders any worse off. They're in exactly the same position as they would have been without this captive reinsurance. And certainly when you think about the fairly traceable standard, the only claim is a lack of disclosure. So... Right. You're talking about there has to be a cataclysm in order for the plaintiffs not to be paid on their policies. That's right. Everything has to fail. Has anything like this ever happened since the beginning of time in New York financial circles? I pressed your adversary on what kind of event we're talking about, and I can't conjure one up. The only thing I can say to that, Your Honor, is neither can I. I'm not aware of anything I can't... 1342 and the plague sweeps over this country and millions and millions of people die. Well, that's right. And really for that reason, there are many, many layers of protections in the law and assets that are held by these insurance companies separate and apart for the captive reinsurance. We didn't see defaults on life insurance from either of these companies post-1929. Right. And I would also point out that we have seen instances of catastrophic loss of life. I mean, after 9-11, these companies were unable. Nobody failed to pay out on the insurance. The only risk I can think of is a nuclear explosion in New York, which wipes out all the reinsurers, wipes out the insurers, causes multiple deaths and wipes out the financial institutions. Wipes out the city. Well, OK, that would be the least of our worries. Look, if it was the test of this court that a nuclear explosion might cause injury, then there wouldn't be a case where you didn't have standing. I mean, I think it's not a – hopefully, hopefully, God help us all, that's not a substantial, certainly impending risk. Hopefully it's not imminent. Well, who could be sure? No comment. No comment. This is a court of law, not a politics. I'd like to just address a few things that Mr. Miller said. He pointed repeatedly to the Department of Financial Services report, and I think the court understands that report and that it didn't say that any insurance company is at risk of an inability to pay claims. It pointed to what was a loophole in their own – actually in their own regulations for not requiring this disclosure. They've now since required the disclosure. But it's also relevant that they didn't require any corrective disclosures. They didn't require any additional infusion of cash. They didn't change the whole process. Right. I mean, and actually since the time of this report, the then Commissioner of Insurance, Benjamin Losky, and this is in the record at the Joint Appendix 356 – oh, I'm sorry, 270. After studying the issue further, the department actually reduced the reserve requirements for insurers in New York, saying that, and we quote, we have determined that our term life formula results in reserves that are high relative to actuarial experience. And he adjusts them downward, saying it's being done in a prudent way that doesn't jeopardize policyholder protections or company solvency. So New York actually reduced the reserve requirements after this report, after studying the issue further. If they were truly troubled, could they do away with the parental guarantee process with the reinsurance? Could they say that the companies themselves have to have the reserves to meet their policies, period, without any way to write off the risk? Sure. I mean, the regulators could have done all kinds of different – No, they could have done that. And they could have done that, but they did not do that. And, you know, and I think that's telling. I can't speak to the full extent of what the regulator might be able to do. But they didn't do any of these things. They required additional disclosures. Once they required the disclosures, the ratings of these companies didn't change. I mean, nothing changed. Did the insurance market change at all after the disclosures? No, the insurance market didn't change at all. Actually, the change that the commissioner made to lower the reserve requirements changed the industry more. But, no, not the disclosures. There was no impact on the plaintiff's policies. There's no change in price. There's no change in the insurance they're entitled to. was that this was going on and it was unpublic. That was the concern, just that it was not generally known? No, I think the regulator was concerned about what the regulator knew because each of these captive reinsurance transactions is approved by the regulator. And so they were pointing primarily to a loophole in their own process. And you can look at some of the rhetoric in that report that Plaintiff's Counsel would like to point you to, I'm sure. But when you look at the takeaways from the report, the department said, we want additional disclosures and we want to look at this further. So it's their own process that they were worried about, their own regulatory scheme? They were interested in looking at their own process. They were interested in looking at the disclosure. They were encouraging others to do the same. They were encouraging others to do the same. And, in fact, there was an effort afoot among other insurance regulators. No other regulator anywhere in the country followed New York. There's actually a whole different protocol out there in some states that I don't need to take the court's time in getting into. But I think the point is that plaintiffs claim that they didn't get these disclosures. Now these disclosures are out there and nothing has changed about their policies, about the ratings, about the pricing. And when you add to that the fact that these are policyholders who want the court to find that they were injured by alleged misrepresentations and omissions that they never experienced, that they don't impact them in any way, that they never saw, never knew about. They don't say they would have influenced their purchase. It's not a claim that supports standing. I realize I'm over my time, but I just would like to add that Mr. Miller made some comments about the relief that plaintiffs are seeking in this case. And we just don't agree at all that the statute could ever support a claim for return of premiums and keeping your life insurance to forever. We don't think the statute supports that, so I just needed to make sure that was on the record. It doesn't seem that that would have passed the legislature without us knowing it, that they get free life insurance forever. That's right. And I realize I'm out of time, but I think if you actually look at the statute here, it doesn't support the notion of any inherent injury. This is a consumer protection statute that gives a contract holder a right to challenge a misrepresentation that affects them in their insurance. I mean, whatever else we might say about that statute, it requires a misrepresentation. And we contend that means a misrepresentation to them, at minimum, that affects the plaintiffs in some way. And here you don't have any of that, and you don't have injury. And you certainly don't have any injury that's traceable to the lack of disclosure. Well, that's where you distinguish Spokio. I mean, Spokio dealt with a particular plaintiff whose information was reported incorrectly. A specific plaintiff. It was directed at that plaintiff, and it contained misinformation about that plaintiff that apparently affected that person in their own ability to secure employment. And the court remanded for that reason. You're saying that that's a different case. There has to be a palpable deprivation that the plaintiffs can point to as a result of an alleged nondisclosure, and this statute just doesn't support it. Thank you, counsel. Thank you. Thank you, Your Honors. Mr. Miller, you have five minutes of rebuttal. But before you start, I have a question to ask. Authoritatively, do you know that it's Spokio, not Spokio? Do you know any of the parties? I do not, Your Honor. On this side of the bench, we think it's Spokio. Well, I'm happy to adopt that and happy to begin with Spokio. Because I think one very important point in that decision is that the court recognized that the legislature can make legally cognizable, quote, injuries that were previously inadequate in law. So even if we think that the risk standing alone or the reduction in value standing alone are not adequate by themselves to constitute Article III injury, in fact, the legislature can make that concrete. And the legislature has done that here by conferring upon policyholders, not the public at large, but people who enter into contractual relationships with the insurance companies, the private right to accurate disclosures in the insurance company's filings. Let's go to the question that was raised at the end of the first argument of the defendants. And that is, when the parental guarantees are not honored, that works a disadvantage to the bank, but it doesn't affect the ability to make payments on the life insurance policies, because the letter of credit has been drawn down from the bank has paid on the letter of credit and just is stuck with the inability to get repaid. And the parental guarantee is worthless, presumably, under those circumstances. So that's the bank's problem. It's not the policyholder's problem. The problem for the policyholder is that these are very long-term relationships here. You've got a 20- or 30-year term life insurance contract. And so the problem that the policyholder faces is, at some point, the parent runs into trouble, and the bank says, okay, we're not going to renew this line of credit going forward. And now the parent orders the insurer to recapture, to take back onto its books the claims that it had reinsured. After the letter of credit has been drawn down and the parental guarantee is not paid. So what you're talking about now is that the system, the overall system is weakened. No, Your Honor, it could be before the letter of credit has even been drawn. The bank says, you know what, we're not going to renew this going forward. So now it turns out. You mean we're not going to pay on the letter of credit? They have a letter of credit they have to pay if they have the money. The letter of credit lasts for some period of time. It's not a permanent letter of credit that would last. Yeah, we've heard the term evergreen. That means it could be drawn on whenever. But with sufficient notice, the bank can end it. And at that point, the ceding insurer has to take the claims back onto its books. That's an additional contingency. That's like number nine now. Well, again, they are all wrapped up in a financial downturn. And I want to go back to the legislative judgment here because what the legislature has done is to make concrete an injury that by itself might not have been sufficient. It's given policyholders a right to accurate disclosures of information. It's very much like the rights, for example, under the Securities Act, which the courts have regularly recognized to be adequate to support standing in Section 11 and Section 12 claims under the Securities Act. There's an immediate market. Public information is really critical to every purchase and sale. Here it's not. These risks weren't even known to these plaintiffs. The difference between shadow insurance and not having shadow insurance wasn't known to the plaintiffs. It's a different setting, isn't it? There are differences in the market, but the relevant common features are that you have a statute that confers upon purchasers a right to accurate disclosures on the theory that the purchasers themselves may not ever go and peruse the regulatory filings. But having that information in the market leads to… Somebody has to show a loss, and it's not so hard in the security business. You've lost money on your stock, and that's it. So there's a claim, and there's an actual tangible loss. Here there's nothing. I mean, under the 1996 amendments, there is now a requirement of loss causation in Section 12 claims that there was not previously. When was the last time a money center bank didn't pay on a letter of credit? I don't know the answer to that, but I do know that there have been life insurance company failures. There have been, and it doesn't require massive mortality. New York? In New York. That's part of what led to this whole regulatory scheme. The New York State Insurance Fund backs up these companies. It partially backs them up, but it does not provide 100 percent protection. When was the last time someone in New York wasn't able to collect on a life insurance promise? I don't know the answer to that, but I do know that it has happened. In the modern age? In the post-1900s. Yes, and that's why we detail in our brief some of the history of the investigation of insurance companies that led to this statute, and that's exactly what the statute was intended to prevent. Thank you. Thank you. Thank you all for a lively argument. We will reserve decision. The next two cases on our calendar are on submission, so I will ask the clerk to adjourn court. Court is adjourned.